UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ZACHARY MEDLOCK | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:11-cv-00977-TWP-DKL |
| | ) | |
| THE TRUSTEES OF INDIANA UNIVERSITY, BENJAMIN MONAHAN-ESTES, in his Individual Capacity, CAITLIN CLARK, in her Individual Capacity, CHRISTOPHER KING, in His Individual Capacity, HAROLD GOLDSMITH, in his Official Capacity and KAREN HANSON, in her Official Capacity, | ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction (Dkt. 8). The Plaintiff in this matter is Zachary Medlock ("Medlock"). There are six Defendants in this matter: The Trustees of Indiana University ("The Trustees"), Benjamin Monahan-Estes ("Monahan-Estes"), Caitlin Clark ("Clark"), Christopher King ("Officer King"), the Dean of Students, Harold Goldsmith ("Dean Goldsmith"), and Karen Hanson ("Provost Hanson") (collectively, "Defendants"). Medlock, a former student at Indiana University (hereinafter, "IU"), filed suit in this Court against the Defendants alleging a violation of his civil rights pursuant to 42 U.S.C. § 1983. Medlock alleges that a one-year suspension from IU following the discovery of marijuana and drug paraphernalia in his university dormitory room violated his

1

constitutional rights under the Fourth Amendment to the United States Constitution, when resident specialists and police officers unlawfully searched his dorm room without a warrant. He also argues that he was denied procedural due process under the Fourteenth Amendment to the United States Constitution when he was not given an opportunity to be heard in a meaningful manner at subsequent university disciplinary hearings.

Medlock asserts he will suffer irreparable harm due to his suspension from IU as his suspension will severely damage future collegiate endeavors as well as hurt future employment opportunities. Medlock seeks a preliminary injunction from this Court and has asked the Court to: (1) enjoin his suspension; (2) order his reinstatement to IU beginning fall semester 2011; (3) remove and expunge the bad grades that he received as a result of the suspension; (4) allow him to resume taking all of the classes he was enrolled in at the time of his suspension; and (5) remove and expunge any reference to discipline relating to the incident from his student record.

For the reasons set forth below, Medlock's Motion for Preliminary Injunction (Dkt. 8) is **DENIED.**

## I. LEGAL STANDARD

A preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (citation and internal quotations omitted). When a court is presented with a request for preliminary injunction, it considers multiple factors. As the Seventh Circuit Court of Appeals has recognized, a party seeking to obtain a preliminary injunction must demonstrate: (1) "a likelihood of success on the merits," (2) "a lack of an adequate remedy at law," and (3) "a future irreparable harm if the injunction is not granted." *Reid L. v. Ill. State Bd. of Educ.*, 289 F.3d 1009, 1020-21 (7th Cir. 2002). The court must then balance, on a sliding

scale, the irreparable harm to the moving party with the harm an injunction would cause to the opposing party. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). The greater the likelihood of success, the less harm the moving party needs to show to obtain an injunction, and vice versa. *Id*. Finally, the court must consider the public interest in determining whether the injunction is to be granted or denied. *See Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994). The decision to grant or deny a request for injunctive relief, however, is not governed by a rigid, unbending formula. As the Seventh Circuit has recognized, a court must "exercise its discretion to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Girl Scouts of Manitou*, 549 F.3d at 1086 (citation and internal quotations omitted).

## II. **BACKGROUND**

Medlock enrolled as a full-time student at Indiana University in Bloomington, Indiana during the Fall Semester of 2009 and studied in the School of Health, Physical Education, and Recreation during the 2009-2010 and 2010-2011 academic years. During Medlock's sophomore year, he lived in a single occupancy unit at Willkie Residence Center ("Willkie").[1] A condition of campus residency is that students agree to the terms of a Housing and Dining Contract ("Housing Contract").[2] The Housing Contract sets forth the terms and conditions which student residents must follow in order to reside in Willkie. The Housing Contract instructed Medlock to

---

[1] Willkie is considered a co-residential university residence hall at IU housing both undergraduate and graduate students. Students must be at least 19 years old and must have lived for at least two semesters in another residence hall at IU before they can apply to live in Willkie. Medlock met these qualifications. (Dkt. 21 at 5).

[2] Although the Housing Contract admitted during the hearing (Exhibit 100) is unsigned, the contract states "You must agree to the contract terms before you can submit your housing preference". It is reasonable to conclude that Medlock was aware of the terms and conditions for Willkie housing.

comply with all rules and regulations set forth in the university's *Code of Student Rights, Responsibilities, and Conduct* ("Student Conduct Code") and *Your A to Z Guide To Residence Hall Living: 2010/11* ("A to Z Guide").[3]

A provision of the Housing Contract states that IU has the "right to enter [a student's] unit according to the procedures set forth in *Your A to Z Guide to Residence Hall Living*…for law enforcement purposes, as well as for custodial services, safety inspections, unit repair and maintenance, pest control, and emergency situations." In addition to the Housing Contract, the A to Z Guide states that "[a]uthorized university personnel performing safety inspections may enter a room or apartment to ensure that health, fire, and safety regulations are being maintained. Whenever possible, residents will be given at least 24-hour notice of these inspections." The A to Z Guide further provides that "the university official conducting the search is free to seize illegal materials in 'plain view'" and "[a]ll evidence seized during searches complying with the above regulations may be used in university disciplinary hearings for violations of the [Student Code of Conduct]…." The A to Z Guide also states that "[i]f an extensive search is required (i.e. opening all drawers, luggage, and locked boxes) and the student has not given permission, the university should contact the IU Police Department for a search warrant." Both the Student Conduct Code and the A to Z Guide require students to obey all state and federal laws and prohibit the unauthorized possession of illegal drugs in IU's residence centers.

On March 9, 2011, Monahan-Estes and Clark, both Resident Leadership Specialists ("Resident Specialists") at Willkie, conducted a routine safety and health inspection of the residence hall in advance of Spring Break. Notice of the inspection had been announced the

---

[3] The A to Z Guide is an annual publication of IU's Department of Residential Programs and Services and clarifies the rights and responsibilities of each student who decides to live in an IU residence dormitory. (Dkt. 21 at 6).

previous week to all Willkie students and on the day of the inspection, the resident specialists announced via intercom that they would be performing room-by-room safety inspections.

Monahan-Estes entered Medlock's room around 4:00 p.m., while Clark checked the room across the hall. Monahan-Estes immediately noticed a clear plastic tube of what appeared to be marijuana lying on Medlock's desk in plain view. Monahan-Estes asked Clark to join him in the room to confirm his suspicion and then called the Indiana University Police Department ("IUPD"). Officer King and Officer Collins responded to the call. Monahan-Estes opened the door and from the hallway, Officer King observed the clear plastic container of marijuana lying on a desk and smelled the odor of raw marijuana. Officer King immediately entered the room to confiscate the marijuana. Once Officer King left Medlock's room, Clark continued her safety inspection as per her responsibilities as a residential specialist. Clark observed further violations of residence center regulations; burned candles, an ashtray with spent ashes and she noticed that Medlock's closet door was ajar. Clark observed a large plant, which she believed to be marijuana, growing inside the closet.

Clark alerted Officer King to her observation, and he re-entered the room where he, too, observed the plant. At that time, Officer King exited the room in order to obtain a search warrant. Officer Collins remained in the hallway and secured the room.

After presenting facts the officer believed supported probable cause to search Medlock's dorm room, Judge Teresa Harper of the Monroe Circuit Court issued a search warrant. The warrant ordered Officer King to search Medlock's room for "narcotics, narcotic paraphernalia, any items used for the sale, use or manufacture of any narcotic…." In the meantime, Medlock had arrived back at his room and was read his Miranda rights by Officer Collins. Officer King returned with the warrant, presented it to Medlock, and Medlock assisted with the search,

revealing the location of a six-foot tall marijuana plant along with a timer, electrical cord, fluorescent light and a second plastic container holding the dead root of a marijuana plant. Approximately 89 grams of marijuana, four marijuana pipes, two bongs, a vaporizer with two tubes, and two mouthpieces were found in various locations in Medlock's dormitory room. Following the search, Officer King arrested Medlock.[4]

On March 10, 2011, this incident was reported to Dean Goldsmith. On March 11, 2011, Dean Goldsmith concluded that Medlock's actions were serious enough to warrant immediate action, believing that Medlock's "continued presence on campus constituted a serious threat of harm to student or to any other person on the campus or to the property of the university or property of other persons on the university campus."[5] Therefore, Dean Goldsmith summarily suspended Medlock and ordered him to vacate the dorm immediately. The suspension would be in effect for "at least one calendar year" from March 11, 2011. On the same day, Dean Goldsmith sent Medlock a letter outlining the decision. The letter apprised Medlock of his right to formal review of the case before the University Hearing Commission ("the Commission") and provided instructions on how to request such a review.

On March 15, 2011, Medlock requested formal review, emphasizing that he did not pose a serious threat to the campus community. In this request, Medlock explained that his arrest was the "direct result of a maintenance person finding a bag of marijuana, in plain view, when he was in my room while I was at class." Medlock also denied ever selling drugs. Medlock was granted a formal review and, on March 28, 2011, he attended the Commission review before a three-

---

[4] Medlock was originally charged with possession of marijuana over 30 grams, a Class D felony and misdemeanor possession of paraphernalia. Both parties have stipulated to the fact that the criminal charges against Medlock were dismissed by the Monroe Circuit Court without prejudice on August 24, 2011.

[5] Dean Goldsmith's determination was based on Part II, H.7 of the Student Conduct Code, which bars "[a]ctions that endanger one's self, others in the university community, or the academic process."

person panel consisting of two faculty members and one student. At the hearing, Medlock was permitted to present evidence and question the Dean of Students' Office Representative. Medlock did not exercise his right to question the representative, but he did present witnesses, including his uncle, an IUPD Lieutenant, and his father. Specifically, Medlock's uncle testified that, in his opinion, Medlock was not a drug dealer and did not pose a threat to the IU community.

That same day, the three-person panel affirmed Dean Goldsmith's decision by letter. The letter also informed Medlock of his right to appeal the decision to Provost Hanson. Soon thereafter, Medlock submitted a written appeal to Provost Hanson. In addition to reiterating that he did not pose a threat, Medlock maintained that he did not understand and was intimidated by the previous proceedings. Provost Hanson granted Medlock, his father, and his attorney a meeting, but, nonetheless, decided to uphold Dean Goldsmith's initial decision. Because Medlock could not complete his classes after the suspension, he received four F's and a D in his five classes for that semester.

### III. REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS

Medlock has raised two main issues in this case: first, whether the marijuana, marijuana paraphernalia, and the marijuana plant observed in his dormitory room by the Resident Specialists and an officer stem from the result of an illegal search and, second, whether Medlock was afforded the appropriate due process in the two subsequent university disciplinary hearings which resulted in his suspension. At this time, the Court finds that neither of Medlock's arguments have a reasonable likelihood of succeeding on the merits. This Court will address each issue in turn.

7

1. **<u>Fourth Amendment Issue</u>**

Because Medlock was residing in a university residence hall when he alleged a Fourth Amendment violation occurred, the Court must, as an initial matter, determine whether Medlock had a reasonable expectation of privacy from government intrusion within his dorm room. On this issue, courts have generally recognized that a student's university dorm room is essentially "a home away from home," and, as such, college students have a reasonable expectation of privacy within their dorm rooms. *See Serpas v. Schmidt*, 827 F.2d 23, 28 (7th Cir. 1987) *abrogated in part on other grounds by Leroy v. Ill. Racing Bd.*, 39 F.3d 711, 714 (7th Cir. 1994) (holding that on-track dormitory rooms for racetrack employees must be considered "homes" under the Fourth Amendment); *Morale v. Grigel*, 422 F. Supp. 988, 997 (D.N.H. 1976) ("A dormitory room is a student's 'home away from home,' and any student may reasonably expect that once the door is closed to the outside, his or her solitude and secrecy will not be disturbed by a governmental intrusion…") (internal quotations added); *see also Smyth v. Lubbers*, 398 F. Supp. 777, 786 (W.D. Mich. 1975) (recognizing that the Fourth Amendment protects college students from unreasonable dorm room searches); *Moore v. Student Affairs Comm. of Troy State Univ.*, 284 F. Supp. 725, 729 (D.C. Ala. 1968).

   **A. Resident Specialist Inspection of Medlock's Dorm Room**

While Medlock had a reasonable expectation of privacy in his dorm room from unreasonable searches committed by state actors, the search performed by Monahan-Estes and Clark did not constitute state action. The Supreme Court has addressed the issue of determining whether an individual is acting as an agent of the government for Fourth Amendment purposes stating "[w]hether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's

8

participation in the private party's activities, a question that can only be resolved 'in light of all the circumstances.'" *Skinner v. Ry. Labor Exec. Ass'n*, 489 U.S. 602, 614-15 (1989). Additionally, in the context of university students, courts have addressed the need to balance a university student's individual right of privacy with a university's institutional responsibility to protect its students from harm by conducting health and safety inspections of a student's dorm room. *See, e.g.*, *State v. Kappes*, 550 P.2d 121, 124 (Ariz Ct. App. 1976) (finding that resident advisors were not state actors when they inspected a room pursuant to the university's rules and found marijuana in plain sight); *State v. Hunter*, 831 P.2d 1033, 1036 (Utah Ct. App. 1991) (finding that a dorm room search by a college official with police was valid under the Fourth Amendment because it was consistent with the university's housing regulations and not an investigation at behest of police); *Durate v. Commonwealth*, 407 S.E.2d 41, 43 (Va. Ct. App. 1991) (same); *but see Morale*, 422 F. Supp. at 996 (recognizing that resident specialist conducting searches of plaintiff's dorm room violated his Fourth Amendment rights because they were state actors).

Further, administrative searches may be legal if conducted pursuant to a reasonable regulatory scheme, but searches for evidence of criminal activity generally require probable cause and a warrant. Compare *Platteville Area Apartment Ass'n v. City of Platteville,* 179 F.3d 574 (7th Cir. 1999) (city ordinance authorizing searches of apartments to determine compliance with housing code violated Fourth Amendment where searches exceeded scope of what was necessary to enforce code provision) with *City of Indianapolis v. Edmond,* 531 U.S. 32, 42-44, 121 S.Ct. 447, 148 L.Ed. 2d 333 (2000) (vehicle checkpoints primarily designed for narcotics interdiction violated Fourth Amendment).

9

In the present case, after reviewing the overall circumstances, this Court concludes that a Fourth Amendment violation did not occur when Monahan-Estes and Clark searched Medlock's room during a health and safety inspection. Universities, such as IU, have an obligation to insure the safety of their students, who reside in residence halls around campus, and conducting health and safety inspections of dorm rooms helps achieve this goal. *See Moore*, 284 F. Supp. at 729 (colleges have "an affirmative obligation to promulgate and to enforce reasonable regulations designed to protect campus order…."). Here, Monahan-Estes, acting in his capacity as a resident specialist, entered Medlock's room for the sole purpose of administering a health and safety inspection in accordance with IU's regulations. Medlock was given notice of this inspection at least 24 hours before it occurred. It is clear that the purpose of the room inspection was not to gather evidence for a criminal proceeding against the student, but to ensure that the student's room was used and maintained in accordance with IU's regulations. *See Morale*, 422 F. Supp. at 998 (recognizing that administrative checks for health hazards are permissible under the Fourth Amendment when they serve to maintain an institution's facilities and the health of its students).

While the actions of the Resident Specialist in conducting the health and safety inspection serve IU at large, the Court finds that they are not tainted with the degree of government authority that will implicate the Fourth Amendment. Both Monahan-Estes and Clark were fulfilling their obligations as resident specialists when they happened to observe a tube of marijuana and a marijuana plant in Medlock's room. Their inspection of Medlock's room was not at the behest of the police, but in accordance with IU's health and safety regulations. Accordingly, their actions do not constitute state action. Once the resident specialists were lawfully inside Medlock's room and discovered the marijuana and marijuana plant in plain view, they were justified in alerting local law enforcement pursuant to IU's

regulations. *See Kappes*, 550 P.2d at 124 (finding that resident specialist were lawfully inside a student's dorm room when conducting a safety inspection in accordance with university regulations). Therefore, this Court finds that Monahan-Estes and Clark's inspection and documentation of university violations occurring in Medlock's room did not violate Medlock's Fourth Amendment rights.[6]

### B. Police Officer's Presence in Medlock's Dorm Room

Medlock also alleges that his Fourth Amendment rights were violated when Officer King of the IUPD entered his dorm room twice without a warrant and observed marijuana and drug paraphernalia in his room. Medlock argues the Defendants may not rely upon the plain view doctrine because Officer King's initial entry on the premise was unlawful. "The plain view exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be." *Washington v. Chrisman*, 455 U.S. 1, 5 (1982); *see also United States v. Berkowitz*, 927 F.2d 1376, 1388 (7th Cir. 1991).

In *Kappes*, the Arizona Appellate Court ruled that once resident advisors were lawfully inside a student's room and discovered marijuana, they were justified in giving access to law enforcement officers, who could seize the drugs in plain view. 550 P.2d at 124. Similar to *Kappes*, Officer King was lawfully at Willkie after responding to a call to the IUPD concerning observation of marijuana. Additionally, Monahan-Estes was justified, as the resident advisors were in *Kappes*, in giving Officer King access to Medlock's room. Thus, Officer King's

---

[6] Even if the Court were to find a Fourth Amendment violation, Medlock has not submitted and the Court has not found, any authority for holding that an exclusionary rule applies in the context of school discipline.

observation of a container of marijuana in plain view and his subsequent seizure of it was proper. Therefore, Officer King's initial entry into Medlock's room did not violate his Fourth Amendment rights.

Moreover, Officer King's re-entry into Medlock's room and his subsequent observation of a marijuana plant in the closet in plain view did not result from an illegal search. In *Segura v. United States*, 468 U.S. 796 (1984), the Supreme Court held that officers who have probable cause may enter and secure the premises from within to preserve the status quo while a search warrant is obtained without violating the Fourth Amendment. *Id.* at 810. "Probable cause to search exists where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *United States v. Alexander*, 573 F.3d 465, 476 (7th Cir. 2009) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (internal citations and quotations omitted)).

Looking at the totality of the circumstances, Officer King initially had probable cause to believe marijuana was in Medlock's room based on the information given to him by Monahan-Estes as he arrived at Willkie. The officer's observation from the hallway of marijuana in plain view on the desk, and the pungent odor of raw marijuana emanating from the room, further supported the reasonable belief that the dorm room contained drugs. Nothing Officer King observed in the room upon re-entering for a second time would have been needed to support the issuance of a search warrant. Because Officer King had probable cause to suspect the dorm room contained drugs, his re-entry into the room was lawful in an effort to corroborate the resident specialist's observation of a plant in the ajar closet and to secure the room; not to conduct a search. *See Alexander*, 573 F.3d at 476 (finding that officers who had probable cause that drugs were present could re-enter an apartment to secure it while waiting to obtain a search

warrant). Thus, Officer King's second re-entry in the apartment did not violate Medlock's Fourth Amendment rights.[7] This Court concludes that Medlock's Fourth Amendment claims do not have a reasonable likelihood of success on the merits.

## 2. Procedural Due Process Issue

Medlock's procedural due process claim is based on the Fourteenth Amendment to the United States Constitution. According to Medlock, the Defendants violated his right to procedural due process by: (1) denying him a pre-deprivation hearing; (2) suspending him based on unlawfully obtained evidence; and (3) by allowing Provost Hanson the ability to review her own initial decision in an unconstitutional manner.

The Fourteenth Amendment provides that no state shall deprive any person of life, liberty or property without due process of law. U.S. CONST. amend. XIV, § 1. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal citations omitted); *see also Reilly v. Daly*, 666 N.E.2d 439, 444 (Ind. Ct. App. 1996) (stating that fundamental requirements of due process in university disciplinary proceedings are notice and opportunity for a hearing appropriate to the nature of the case). Medlock first claims that his due process rights were violated when he was denied a pre-deprivation hearing prior to Dean Goldsmith's decision to summarily suspend him from the university on March 11, 2011. Medlock argues that since he no longer posed as "a continuing danger to persons or property or

---

[7] Even assuming Officer King's entry into Medlock's room constituted a Fourth Amendment search, the Court finds the inevitable discovery doctrine would be applicable and provide an independent basis for upholding the dorm room search. "Under the inevitable discovery doctrine, the exclusionary rule is inapplicable where the government establishes by a preponderance of the evidence 'that information ultimately or inevitably would have been discovered by lawful means'" *Alexander*, 573 F.3d at 477. Here, Officer King was given information by the resident specialist of their observations of marijuana in the dorm room. A search warrant would certainly have been issued based on this information alone. Thus, the marijuana, marijuana plant, and paraphernalia would inevitably have been discovered after the search warrant issued.

an ongoing threat of disrupting the educational process," on March 11, 2011, he was entitled to a pre-deprivation hearing.

The Court is not persuaded. The Defendants direct the Court's attention to *Gross v. Lopez*, 419 U.S. 565 (1975), in which the Supreme Court held that a timely post-deprivation hearing after a summary suspension ruling is consistent with due process when an administrator could conclude that a student's "presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process...." *Id.* at 582. In this case, Dean Goldsmith testified that based on the quantity of marijuana, the cultivation of a six foot tall marijuana plant, and drug paraphernalia found in Medlock's room, he concluded Medlock's presence on campus posed a threat to other university students. Based upon the quantity of drugs, Dean Goldsmith reasonably believed that Medlock intended to sell or share illegal drugs while living in an IU residence hall. Additionally, Provost Hanson testified by way of deposition that Medlock's possession of marijuana was a threat to students in her professional judgment. Provost Hanson stated the following:

> [D]ormitories are small spaces, and the fact that something like this is going on is not something that doesn't become known quite quickly to students. It's something that's at odds with the enterprises we want to have going on, on our campus, and it's a physical health threat to the students as well. I upheld it because I thought that this behavior was a threat to the student and to other students.

The testimony given by both Dean Goldsmith and Provost Hanson regarding the impact of Medlock's continued presence on campus and the two post-deprivation hearings afforded to him were consistent with affording due process under *Gross*. *See Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (recognizing that post-deprivation hearings were constitutionally sufficient in regards to procedural due process); *see also Jones v. City of Gary*, 57 F.3d 1435, 1444 (7th Cir. 1995).

Additionally, Medlock presented evidence to the Commission in the form of written statements, that he was not a danger to himself or others in the academic community. Medlock also presented witnesses to the Commission, which included his father and his uncle, an IUPD Lieutenant, who informed the Commission that Medlock did not pose a threat to the campus community. Finally, Medlock was granted an additional meeting, not required by university rules, with Provost Hanson to appeal the Commission's ruling. His father and his attorney were allowed to attend the meeting and present additional arguments. This Court finds that Medlock was allowed to present mitigating arguments to Provost Hanson at a meaningful time and in a meaningful manner. *See Reilly*, 666 N.E.2d at 444 (emphasizing that due process does not require an "elaborate hearing before a neutral party, but 'simply an informal give-and-take between student and disciplinarian.'"). Therefore, Medlock's due process rights were not violated in the absence of a pre-deprivation hearing.

Next, Medlock claims that the Defendants violated his due process rights by suspending him based on unlawfully obtained evidence. This argument falters because, as the Court ruled previously, Medlock's Fourth Amendment rights were not violated by the Defendants. Therefore, any evidence presented to the Commission and to Provost Hanson in accordance with IU's rules and regulations was lawfully obtained. *See Morale*, 422 F. Supp. at 1000-01 (refusing plaintiff's arguments to extend the exclusionary rule to apply to university disciplinary hearings).

Medlock further claims he was not given an impartial hearing by Provost Hanson because her prior involvement in the proceeding tainted her subsequent decision to uphold his punishment. Stated differently, Medlock argues Provost Hanson's review of Dean Goldsmith's decision to suspend Medlock while "acting as the Designee of the Provost" allowed Provost Hanson the opportunity to review her own decision. In support of this argument, Medlock cites

15

*Morrissey v. Brewer*, 408 U.S. 471 (1972). In *Morrissey*, the petitioner, a parolee, violated various rules of his parole and his parole officer recommended revocation of his parole in a written report to the state parole board. *Id.* at 473. The parole board, relying on the written report authored by the parole officer, subsequently revoked the petitioner's parole status. *Id.* The petitioner argued the procedure used by the parole officer in recommending revocation violated his due process rights. *Id.* The Supreme Court held that in regards to parole revocation, an uninvolved person is required to make the preliminary evaluation asserting the basis for believing the conditions of parole have been violated. *Id.* at 486.

In the Court's view, *Morrissey* is readily distinguishable. Unlike in *Morrissey*, where the parole officer was involved in both the recommendation and evaluation phase in parole proceedings, Provost Hanson's review was completely independent of Dean Goldsmith's initial decision. There was no evidence submitted to the Court to establish that Provost Hanson was directly involved in recommending Medlock's suspension in the disciplinary letter dated March 11, 2011. Moreover, Provost Hanson testified that she had the authority to overrule Medlock's punishment or even lessen it, strengthening the view that she was acting as an independent decisionmaker. Because Provost Hanson's role in reviewing of Medlock's summary suspension from IU did not create an impermissible risk that his appeal was biased, Medlock's argument fails.

For these reasons, the Court finds Medlock's procedural due process arguments do not have a reasonable likelihood of success on the merits.

## IV. **IRREPARABLE HARM**

Having found that Medlock's constitutional claims show no likelihood of succeeding on the merits, the Court will not analyze Medlock's irreparable harm claim in detail; after all,

Defendants have already demonstrated that Plaintiff cannot satisfy the requirements for receiving preliminary injunctive relief.

The irreparable harm alleged by Medlock is as follows:

> Although seldom appreciated until later in life, the friendships and experiences of college are a precious gift. During these short years, students have opportunities which most will never be able to enjoy again when they start careers and families. Zack's suspension from IU has derailed his college career. Aside from interrupting his diploma track, the permanent record of discipline and failing grades will probably have long-term adverse consequences for his academic achievement and job opportunities.

(Dkt. 8, page 8.)

The Court has serious doubts as to whether Medlock would suffer irreparable harm given that Medlock was admitted into George Mason University for the 2011-2012 academic school year, and he voluntarily declined admission. The motion for a preliminary injunction is aimed at preventing the consequences of the suspension. See, *Heller v. Hodgin,* 928 F.Supp. 789 (S.D.Ind. 1996) (holding that plaintiff presented no evidence that her chances of being accepted into the college of her choice or of obtaining financial aid had been diminished in the slightest. Her allegation of injury is the crudest speculation). Medlock himself has derailed an opportunity to timely reinstate his "diploma track" and resume the "experiences of college" at George Mason University, a very fine institution.

Additionally, Medlock will be eligible for reinstatement at IU. Dean Goldsmith testified that he could see no reason why Medlock could not obtain reinstatement to IU after March 11, 2012, when his summary suspension would end. Moreover, Medlock will have the opportunity at that time to re-take the courses he failed as a result of his suspension and to make some amend his grade point average. Further, Medlock's suspension will not be permanently noted on his academic transcript. The record of suspension is maintained by the Dean of Students in a

17

confidential file that is protected by the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g; 34 CFR Part 99 and is obtainable only through Medlock's consent .

Finally, Medlock presented evidence that he might experience difficulty obtaining certain "secret" classifications for companies such as the one where his father works. However, Medlock is pursuing a career in sports management, a field where security classification is unlikely. Medlock has failed to introduce sufficient evidence that his interest in academic pursuits or future employment have been irreparably harmed. To the contrary, the one year suspension may empower Medlock to not make similar mistakes in his future.[8]

## V. CONCLUSION

As Medlock has failed to satisfy either of the first two threshold requirements for injunctive relief, the Court need not balance the hardship between the parties or determine the public interest. For the reasons set forth herein, Medlock's Motion for a Preliminary Injunction (Dkt. 8) is **DENIED.**

SO ORDERED

DATE: 09/13/2011

*[signature]*

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution attached.

---

[8] At all stages of administrative review, Medlock admitted that he possessed the drugs and paraphernalia, that he was growing marijuana in the residence center and that he was deeply ashamed of his actions.

18

DISTRIBUTION:

Thomas W. Blessing
tom@frazierattorneys.com

Ronald W. Frazier
ron@frazierattorneys.com

Trenten D. Klingerman
tdk@stuartlaw.com

John M. Stuckey
jms@stuartlaw.com