UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ZACHARY MEDLOCK, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) |
| | ) |
| THE TRUSTEES OF INDIANA | ) |
| UNIVERSITY, | ) |
| BENJAMIN MONAHAN-ESTES In His | ) |
| Individual Capacity, | )   Case No. 1:11-cv-00977-TWP-DKL |
| CAITLIN CLARK In Her Individual | ) |
| Capacity, | ) |
| CHRISTOPHER KING In His Individual | ) |
| Capacity, | ) |
| HAROLD GOLDSMITH In His Official | ) |
| Capacity, | ) |
| KAREN HANSON In Her Official Capacity, | ) |
| | ) |
|     Defendants. | ) |

## ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants the Trustees of Indiana University (the "Trustees"), Benjamin Monahan-Estes ("Mr. Monahan-Estes"), Caitlin Clark ("Ms. Clark"), Christopher King ("Officer King"), Harold Goldsmith ("Dean Goldsmith"), and Karen Hanson's ("Provost Hanson") (collectively, "Defendants") Motion for Summary Judgment (Dkt. 74), which was filed simultaneously with Plaintiff Zachary Medlock's ("Mr. Medlock") Motion for Summary Judgment (Dkt. 76). This lawsuit arises from Mr. Medlock's challenge of the constitutionality of a search of his dormitory room, which he claims violated the Fourth Amendment prohibition against unreasonable search and seizure. He also challenges the use of evidence obtained in the search in his university disciplinary proceeding under the Fourth Amendment exclusionary rule, as well as the disciplinary process itself as a violation of his

Fourteenth Amendment right to procedural due process. For the reasons set forth below, Mr. Medlock's motion for summary judgment is **DENIED** and Defendants' motion for summary judgment is **GRANTED**.

## I. BACKGROUND

The facts of this case have already been set forth in detail in the Court's prior Entry on Plaintiff's Motion for Preliminary Injunction, thus only a brief recitation of the material facts will be recounted here. Mr. Medlock is a former student of Indiana University, Bloomington Indiana campus (hereinafter, "IU"), who was given a one year suspension following the discovery of marijuana and drug paraphernalia in his university dormitory room. During the 2010-2011 academic year, Mr. Medlock, an undergraduate sophomore student, lived in a single occupancy unit at Wilkie Residence Center ("Wilkie"). As a condition of his residency, Mr. Medlock was required to agree to the terms of a Housing and Dining Contract, as well as comply with all of the rules and regulations set forth in IU's *Code of Student Rights, Responsibilities, and Conduct* ("Student Code of Conduct") and *Your A to Z Guide to Residence Hall Living: 2010/11* ("A to Z Guide").

On March 2, 2011, an e-mail was sent to all Wilkie residents announcing that a health and safety inspection would take place on March 9, 2011, prior to spring break. Another announcement was made by the resident specialists on the day of the inspection via the dormitory's intercom system, informing residents that they would be performing room-by-room safety inspections. Resident specialists are students employed by the university to provide duty coverage and crisis management in resident centers and one of their responsibilities is to conduct routine health and safety inspections. These inspections are announced and occur four times

2

during the school year – before Thanksgiving break, before winter break, before spring break and at the end of the school year.

On March 9, 2011, Mr. Monahan-Estes, one of Wilkie's resident specialists, entered Mr. Medlock's room around 4:00 p.m., while Ms. Clark, another resident specialist, checked the room across the hall. Immediately upon entering the room, Mr. Monahan-Estes saw a clear plastic tube, containing what he believed to be marijuana, lying on Mr. Medlock's desk in plain view. Mr. Monahan-Estes asked Ms. Clark to join him in Mr. Medlock's room to confirm his suspicion, and then called the Indiana University Police Department ("IUPD"). Officer King and Officer Collins responded to the call. When Officer King entered the room, he observed the tube of marijuana on Mr. Medlock's desk, and he smelled the odor of raw marijuana. Officer King confiscated the marijuana and left Mr. Medlock's room. Ms. Clark and Mr. Monahan-Estes continued the safety inspection of the room, noting several other violations of the residence regulations such as burned candles and an ashtray of spent ashes. Open flames and smoking are both safety violations of the housing regulations. Mr. Monahan-Estes noticed that Mr. Medlock's closet door was ajar and observed what he believed to be a marijuana plant. Ms. Clark also noticed that Mr. Medlock's closet door was ajar, and she was able to see a large plant through the door opening, which she also believed to be marijuana. Ms. Clark alerted Officer King, who had not yet left the floor. Officer King re-entered the room where he, too, observed the nearly six foot plant in the closet. Officer King then exited the room in order to obtain a search warrant, while Officer Collins remained in the hallway and secured the room.

Judge Teresa Harper of the Monroe Circuit Court issued a warrant to search Mr. Medlock's room for narcotics, narcotic paraphernalia, and any items used for the sale, use or manufacture of any narcotics, based upon Officer King's presentation of the facts that he

believed supported probable cause. Meanwhile, Mr. Medlock returned to his room and was detained by Officer Collins and read his Miranda rights. When Officer King returned with the search warrant, Mr. Medlock assisted with the search, revealing the location of a six-foot tall marijuana plant in his closet, a fluorescent light and other accessories for cultivating such plant, as well as other drug paraphernalia associated with the use of marijuana in various locations in his dormitory room. Following the search, Officer King arrested Mr. Medlock.[1]

On March 11, 2011, Dean Goldsmith, the Dean of Students at IU's Bloomington campus, summarily suspended Mr. Medlock for a period of one year, concluding that his conduct was serious enough to warrant immediate action. Dean Goldsmith is responsible for administering the Student Code of Conduct. Mr. Medlock was instructed to immediately vacate the dormitory. The one-year suspension was to be in effect until March 11, 2012. That same day, Dean Goldsmith sent Mr. Medlock a letter outlining the decision and apprising him of his right to a formal review of his case before the University Hearing Commission (the "Commission), and provided instructions on how to request such a review as set forth in the Student Code of Conduct. On March 15, 2011, Mr. Medlock requested a review, and the Commission held a hearing on March 28, 2011. Mr. Medlock attended the hearing and was permitted to present evidence on his behalf, including witnesses who testified as to his character.[2] The same day, the three-person Commission panel affirmed Dean Goldsmith's decision and sent Mr. Medlock a letter informing him of their decision, as well as informed him of his right to appeal the decision to Provost Hanson, the academic officer responsible for the University's Division of Student

---

[1] Mr. Medlock was originally charged with possession of marijuana over 30 grams, a Class D felony, and misdemeanor possession of paraphernalia. The criminal charges against Mr. Medlock were dismissed by the Monroe Circuit Court without prejudice on August 24, 2011.

[2] Mr. Medlock's father and brother-in-law, who is an IUPD Lieutenant, spoke on his behalf and argued Mr. Medlock was not a threat to the campus community. At no time did Mr. Medlock deny that he possessed the drugs or paraphernalia, or allege that the search was improper.

4

Affairs. Mr. Medlock submitted a written appeal to Provost Hanson, claiming that he did not understand and was intimidated by the previous proceedings. Provost Hanson granted Mr. Medlock, his father and his attorney a meeting, but she nevertheless decided to uphold Dean Goldsmith's decision. Because Mr. Medlock could not complete his classes following the suspension, he received four Fs and a D in the five classes he was enrolled in for that semester.

## II.  LEGAL STANDARD

Summary judgment is only appropriate by the terms of Rule 56(c) where there exists "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The coincidence that both parties moved simultaneously for summary judgment does not relax the standards under Rule 56. The standard applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). Rather, the process of taking the facts in the light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Ins.*, 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

### III.  DISCUSSION

The parties have filed motions for summary judgment on all counts of Mr. Medlock's Complaint, which are essentially the same issues previously addressed by the Court in its Entry on Plaintiff's Motion for Preliminary Injunction, namely: (1) whether the health and safety inspection of Mr. Medlock's room by the resident specialists constituted "state action" for purposes of the Fourth Amendment; (2) whether Mr. Medlock's Fourth Amendment rights were violated when Officer King initially entered his dormitory room after the resident specialists observed the tube of marijuana and the marijuana plant in the closet; and (3) whether the Trustees violated Mr. Medlock's Fourteenth Amendment procedural due process rights in the process of suspending him from IU for a year.  The parties also present arguments regarding whether the Trustees violated Mr. Medlock's Fourth Amendment rights by considering the drug evidence in his suspension hearing before the Commission and subsequent appeal before Provost Hanson.[3]

**A.   Fourth Amendment Issues**

>   **1.   The resident specialists were not "state actors" when performing the health and safety inspection of Mr. Medlock's room.**

Mr. Medlock argues that the IU resident specialists, Mr. Monahan-Estes and Ms. Clark, were state actors when they performed the health and safety inspection of his dormitory room. He argues that because the resident specialists were trained by IUPD to identify marijuana, and they did, in fact, find marijuana in Mr. Medlock's room, at least one of the purposes of their search was to perform a criminal investigation.  Defendants argue that Mr. Monahan-Estes and

---

[3] Defendants also presented a sovereign immunity argument in their brief, contending that Mr. Medlock cannot recover money damages from the Trustees or individuals sued in their official capacities; however, Mr. Medlock only requested prospective injunctive relief from these defendants so this argument is inapplicable.  *See* Dkt. 1. At 4-5.

6

Ms. Clark were performing an institutional purpose search, and therefore their actions do not fall under the purview of the Fourth Amendment.

As the Court has determined in its prior Entry (Dkt. 31), the resident specialists' actions in performing the health and safety inspections of all of the Wilkie dormitory rooms, including Mr. Medlock's, did not constitute state action, and Mr. Monahan-Estes and Ms. Clark were not state actors. The parties do not dispute that students have some expectation of privacy, and the Court recognizes that a student's university dormitory room is essentially "a home away from home" and is protected from unreasonable government intrusion. *See Serpas v. Schmidt*, 827 F.2d 23, 28 (7th Cir. 1987), *abrogated in part on other grounds by Leroy v. Ill. Racing Bd.*, 39 F.3d 711, 714 (7th Cir. 1994) (holding that on-track dormitory rooms for racetrack employees must be considered "homes" under the Fourth Amendment); *Morale v. Grigel*, 422 F. Supp. 988, 997 (D.N.H. 1976) ("A dormitory room is a student's home away from home, and any student may reasonably expect that once the door is closed to the outside, his or her solitude and secrecy will not be disturbed by a governmental intrusion . . ."); *see also Smyth v. Lubbers*, 398 F. Supp. 777, 786 (W.D. Mich. 1975) (recognizing that the Fourth Amendment protects college students from unreasonable dormitory room searches); *Moore v. Student Affairs Comm. of Troy State Univ.*, 284 F. Supp. 725, 729 (D.C. Ala. 1968). However, universities, such as IU, have an obligation to ensure the safety of their students, and may conduct health and safety inspections of dormitory rooms to help achieve this goal. *Moore*, 284 F. Supp. at 729. Under *Moore*, the validity of these regulations to protect campus order is determined by whether the regulation is a *reasonable* exercise of the college's authority. (Emphasis added.)

Courts have addressed the need to balance a university student's individual right of privacy with a university's institutional responsibility to protect its students from harm by

7

conducting such inspections. *See, e.g.*, *State v. Kappes*, 550 P.2d 121, 124 (Ariz. Ct. App. 1976) (finding that resident advisors were not state actors when they inspected a room pursuant to the university's rules and found marijuana in plain sight); *State v. Hunter*, 831 P.2d 1033, 1036 (Utah Ct. App. 1991) (finding that a dormitory room search by a college official with police was valid under the Fourth Amendment because it was consistent with the university's housing regulations and not an investigation at the behest of police); *Durate v. Commonwealth*, 407 S.E.2d 41, 43 (Va. Ct. App. 1991) (same); *but see Morale*, 422 F. Supp. at 996 (recognizing that resident specialist conducting searches of plaintiff's dorm room while investigating an alleged theft violated his Fourth Amendment rights because they were state actors). Administrative searches may be legal if conducted pursuant to a legitimate institutional purpose that furthers an interest that is separate and distinct from the state's criminal law. *See Morale*, 422 F. Supp. at 998; *Kappes*, 550 P.2d at 124; *cf. City of Indianapolis v. Edmond*, 531 U.S. 32, 42-44 (2000) (vehicle checkpoints primarily designed for narcotics interdiction violated Fourth Amendment).

Mr. Medlock does not dispute that there are legitimate, non-law enforcement reasons for IU to conduct inspections of its students' dormitory rooms. The Court finds that the health and safety inspections performed by IU resident specialists Mr. Monahan-Estes and Ms. Clark were conducted pursuant to a reasonable regulatory scheme for a legitimate institutional purpose. IU performs routine health and safety inspections of its resident centers approximately four times during the school year. The undisputed evidence shows that all of the students residing in Wilkie were informed a week in advance that a safety inspection would take place in all dormitory rooms prior to spring break. On the day of the inspection, an announcement was made over the intercom system to all residents that the inspections would be taking place. Contrary to Mr. Medlock's assertion, the purpose of the room inspections was not to gather evidence of criminal

activities, but to check for violations of the Student Code of Conduct and the A to Z Guide. Illegal substances were only one of many violations that the resident specialists were checking for in the inspections. The fact that Mr. Medlock was found to have violated this particular provision of the regulations does not change the nature and purpose of Mr. Monahan-Estes's and Ms. Clark's inspection, nor does the fact that they were trained by IUPD to identify marijuana. Once the resident specialists were lawfully inside Mr. Medlock's room and discovered the marijuana and marijuana plant in plain view, they were justified in alerting local law enforcement pursuant to IU's regulations. The continuation of the resident specialists' inspection of Mr. Medlock's room was limited to their original institutional purpose, which was to document any additional residence code violations, and did not extend to areas outside the scope of this limited inspection. *Cf. Platteville Area Apartment Ass'n v. City of Platteville*, 179 F.3d 574, (7th Cir. 1999) (city ordinance authorizing searches of apartments to determine compliance with housing code violated Fourth Amendment where searches exceeded scope of what was necessary to enforce code violations). Therefore, the Court finds that Mr. Monahan-Estes's and Ms. Clark's inspection and documentation of university violations occurring in Mr. Medlock's dormitory room did not constitute state action, and thus did not violate Mr. Medlock's Fourth Amendment rights. Furthermore, because Mr. Monahan-Estes and Ms. Clark were performing a reasonable and lawful inspection, the Court finds that they are not liable to Mr. Medlock in their individual capacities.

      **2.**      **Officer King's entry into Mr. Medlock's room did not violate the Fourth Amendment.**

Mr. Medlock also alleges that his Fourth Amendment rights were violated when Officer King of the IUPD entered his room twice without a warrant and observed the tube of marijuana and the marijuana plant. Importantly, Defendants argue that Officer King's entry into the room

was lawful under the plain view doctrine. "The 'plain view' exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be." *Washington v. Chrisman*, 455 U.S. 1, 5 (1982); *see also United States v. Berkowitz*, 927 F.2d 1376, 1388 (7th Cir. 1991).

In *Kappes*, the Arizona Appellate Court addressed a similar circumstance in which resident advisors discovered marijuana in a student's room. The Arizona Appellate Court found that once resident advisors were lawfully inside a student's room and discovered the marijuana, they were justified in giving access to law enforcement officers, who could seize the drugs in plain view. 550 P.2d at 124. Officer King was lawfully at Wilkie after responding to a call to the IUPD concerning the observation of marijuana in Mr. Medlock's room. Additionally, Mr. Monahan-Estes was justified in giving Officer King access to Mr. Medlock's room after observing the marijuana in plain view, just as the resident advisors were in *Kappes*.

Mr. Medlock argues this case is distinguishable from *Kappes* because there is no evidence before the Court that he actually signed a university housing contract which included consent to room inspections. However, Mr. Medlock chose to reside in an IU dormitory. The A to Z Guide, which Mr. Medlock had to agree to abide by as a condition of his residency in the dormitory, specifically states that IU officials have the right to enter a student's room "for law enforcement purposes" and that "the university official is free to seize illegal materials in 'plain view'" and that "[i]f an extensive search is required (i.e. opening all drawers, luggage, and locked boxes) and the student has not given permission, the university should contact the IU Police Department for a search warrant." Dkt. 76-8 at 12-13. The A to Z Guide further states "[a]uthorized university officials may enter a room or apartment where there is probable cause to

believe that violations of university or civil regulations are being committed. . . . Probable cause means having reasonable grounds for suspicion, supported by circumstances sufficiently strong to justify a cautious person's belief that a party is committing an illegal act." *Id.* at 13.   This is the same standard for probable cause articulated by the Seventh Circuit and the Supreme Court. *See United States v. Alexander*, 573 F.3d 465, 476 (7th Cir. 2009); *Orneals v. United States*, 517 U.S. 690, 696 (1996).

Officer King initially had probable cause to enter the room based upon the observation of the tube of marijuana in plain view on Mr. Medlock's desk, as well as the odor of raw marijuana in the room.  This alone would have been sufficient to justify the issuance of a search warrant. Because he already had probable cause to suspect that Mr. Medlock's room contained illegal drugs, his re-entry into the room after being informed about the suspicious plant, observable through the open closet door, as well as to secure the room so that he could go obtain a search warrant, was not in violation of the Fourth Amendment.  *See Alexander*, 573 F.3d at 476 (finding that officers who had probable cause that drugs were present could re-enter an apartment to secure it while waiting to obtain a search warrant).  Thus, the Court finds that Officer King's entry into Mr. Medlock's dormitory room, and subsequent search after obtaining a search warrant, did not violate the Fourth Amendment.

**B.     Procedural Due Process Issue**

Mr. Medlock argues that his Fourteenth Amendment procedural due process rights were violated by the Trustees because he was denied a pre-deprivation hearing, suspended based upon unlawfully obtained evidence, and because Provost Hanson was allowed to review her own initial decision in an unconstitutional manner.  Defendants argue that Mr. Medlock was afforded sufficient opportunity to address the charges and present evidence on his behalf before both the

11

Commission and Provost Hanson at a timely post-deprivation hearing, which is all that is required for due process in university disciplinary proceedings.

### 1. Mr. Medlock was not entitled to a pre-deprivation hearing.

The Fourteenth Amendment provides that no state shall deprive any person of life, liberty or property without due process of law. U.S. CONST. amend. XIV, § 1. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal citations omitted). For university disciplinary proceedings, the fundamental requirements of due process are notice and an opportunity for a hearing appropriate to the nature of the case. *Reilly v. Daly*, 666 N.E.2d 439, 444 (Ind. Ct. App. 1996). Mr. Medlock claims that his due process rights were violated when he was denied a pre-deprivation hearing prior to Dean Goldsmith's decision to summarily suspend him from the university because he no longer posed a continuing threat to the university or the educational process.

The Supreme Court has held that a timely post-deprivation hearing after a summary suspension ruling is consistent with due process when an administrator could conclude that a student's "presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process . . . ." *Goss v. Lopez*, 419 U.S. 565, 582 (1975). In this case, Dean Goldsmith testified in his deposition that based upon the large quantity of marijuana, the cultivation of a six foot tall marijuana plant, and the number of drug paraphernalia items found in Mr. Medlock's room, he concluded that Mr. Medlock's presence on campus posed a threat to himself and other university students. Provost Hanson also testified that in her professional judgment, the possession of marijuana in the quantity found in Mr. Medlock's room posed a threat to himself and other students, which was her basis for upholding Dean Goldsmith's and

the Commission's decisions. Mr. Medlock argues that the evidence does not support the determination that he posed a continuing threat to other students or the educational process, thus his situation does not fall within the exception for the requirement of a pre-deprivation hearing.

The Court finds that the testimony given by both Dean Goldsmith and Provost Hanson regarding the impact of Mr. Medlock's continued presence on campus and the two post-deprivation hearings afforded to him were consistent with affording due process under *Goss*. Shortly after his suspension, Mr. Medlock was afforded the opportunity to present evidence to both the Commission and Provost Hanson that he was not a danger to himself or others in the academic community, as well as to present witnesses to testify on his behalf. It is the Court's job to determine whether Mr. Medlock received adequate due process under the circumstances, not to review the decision of the university or second-guess the university officials' determination as to what constitutes a "threat of disrupting the academic process." To do so would open the floodgates of students seeking to use the federal court system as a means of appealing decisions that are properly left to university officials, and which should be resolved through the administrative channels set up by these institutions. The Court finds that Mr. Medlock was allowed to present mitigating arguments to the Commission and Provost Hanson at a meaningful time and in a meaningful manner appropriate for the circumstances. *See Reilly*, 666 N.E.2d at 444 (emphasizing that due process does not require an "'elaborate hearing' before a neutral party, but 'simply an informal give-and-take between student and disciplinarian.'" (quoting *Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 16 (1st Cir. 1988)). Therefore, Mr. Medlock's due process rights were not violated by not being afforded a pre-deprivation hearing, and the timely post-deprivation hearing was sufficient to satisfy the requirements of due process.

### 2. Evidence obtained in the search of Mr. Medlock's room was lawfully used in his disciplinary proceedings.

Mr. Medlock also claims that the Trustees violated his due process rights by suspending him based upon unlawfully obtained evidence. As the Court has already determined, Mr. Medlock's Fourth Amendment rights were not violated by the Defendants, and the evidence obtained from the search was lawfully obtained. Therefore, any evidence presented to Dean Goldsmith, the Commission, and Provost Hanson in accordance with IU's rules and regulations was lawfully considered. In addition, the Supreme Court has held that the Fourth Amendment exclusionary rule does not apply in civil proceedings. *Penn. Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 363-64 (1998); *see also Morale*, 422 F. Supp. at 1000-01 (refusing to extend exclusionary rule to apply to university disciplinary proceedings). This rule is particularly applicable in this situation, as Mr. Medlock was suspended for violating university rules and regulations, not, as Mr. Medlock argues, as a result of a finding that he violated Indiana criminal law. Thus, the Court finds the use of this evidence did not violate Mr. Medlock's due process rights.

### 3. The review of Mr. Medlock's summary suspension satisfied due process requirements.

Next, Mr. Medlock argues that his procedural due process rights were violated because the Commission could only uphold or reverse Dean Goldsmith's suspension decision, not modify his punishment. Mr. Medlock cites to *Lamb v. Panhandle Comm. Unit Sch. Dist. No. 2*, 826 F.2d 526 (7th Cir. 1987) for the proposition that due process requires that he be given an opportunity to be heard on what discipline is warranted, and because he was not allowed to present mitigating evidence or request a lesser punishment, his due process rights were violated. However, *Lamb* only requires that the student be allowed to present a "mitigative argument" in

14

order to satisfy due process, an opportunity which Mr. Medlock was afforded.  The Court has already established that a post-deprivation hearing was sufficient to satisfy due process, thus Mr. Medlock's argument that he should have been afforded the opportunity to present mitigating arguments prior to Dean Goldsmith's decision is just another way of stating that he should have been afforded a pre-deprivation hearing.  The undisputed evidence shows that Mr. Medlock had the opportunity to present mitigating evidence and witnesses, and argue that he was not a threat to the campus community, both in his hearing with the Commission and to Provost Hanson.  The Commission had the ability to change Mr. Medlock's punishment by means of reversing Dean Goldsmith's decision, and Provost Hanson testified that she had the authority to overrule Mr. Medlock's punishment or lessen it.  Thus, Mr. Medlock's fate had not "already been sealed" by Dean Goldsmith's summary suspension, and he was provided an adequate opportunity to present mitigative arguments in accordance with the due process procedures appropriate for the situation.

Finally, Mr. Medlock argues that Provost Hanson was essentially reviewing her own decision because Dean Goldsmith was acting as Provost Hanson's designee when he imposed the suspension, thus her review did not comply with due process requirements.  In support of this argument, Mr. Medlock cites to *Morrissey v. Brewer*.  408 U.S. 471, 486-88 (1972), in which the Supreme Court determined that in the context of a parole revocation proceeding, an uninvolved person is required to make the preliminary evaluation asserting the basis for believing the conditions of parole had been violated, and the parole board could not solely rely upon the written report authored by the parole officer in making its revocation decision.  However, this case is unlike the situation in *Morrissey* in that the same person was not involved in both stages of the proceedings.  Provost Hanson's review was completely independent of Dean Goldsmith's initial decision.  There is no evidence that establishes that Provost Hanson was directly involved

in recommending Mr. Medlock's suspension, only that Dean Goldsmith was acting "as the designee of the Provost" and her only involvement was receiving a copy of his determination. Provost Hanson acted as an independent decision maker and had the authority to overrule or modify Mr. Medlock's punishment. Because Provost Hanson's role in reviewing Mr. Medlock's summary suspension from IU did not create an impermissible risk that his appeal was biased, the Court finds that this review did not deprive Mr. Medlock of due process.

### IV.  CONCLUSION

For the reasons set forth above, the Court finds that Defendants did not violate Mr. Medlock's Fourth Amendment or Fourteenth Amendment rights, and therefore Defendants' summary judgment motion (Dkt. 74) is **GRANTED** and Mr. Medlock's summary judgment motion (Dkt. 76) is **DENIED**.

**SO ORDERED**.

Date: 03/28/2013

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Ronald William Frazier
FRAZIER & ASSOCIATES
ron@frazierattorneys.com

John Mathews Stuckey
STUART & BRANIGIN LLP
jms@stuartlaw.com

Trenten D. Klingerman
STUART & BRANIGIN LLP
tdk@stuartlaw.com